## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                                          Case No. 3:20-bk-31620-SHB

K&L TRAILER LEASING, INC.              Chapter 11

           Debtor

      GREENEVILLE FEDERAL BANK, FSB

          Plaintiff

        v.                             Adv. Proc. No. 3:23-ap-03004-SHB

      FIRST MIDWEST EQUIPMENT FINANCE CO.

          Defendant

### MEMORANDUM ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**APPEARANCES**:    LAUGHLIN, NUNNALLY, HOOD & CRUM, PC
          Jerry W. Laughlin, Esq.
          100 South Main Street
          Greeneville, Tennessee  37743-4922
          Attorneys for Plaintiff

          FERRARO HANCOCK & ASSOCIATES, PLLC
          Victoria A. Ferraro, Esq.
          4219 Hillsboro Pike
          Suite 302
          Nashville, Tennessee  37215
          Attorneys for Defendant

**SUZANNE H. BAUKNIGHT**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff Greeneville Federal Bank, FSB ("GFB") initiated this adversary proceeding by the filing of its complaint (as amended) seeking determination by the Court that GFB's properly perfected inventory lien relating to K & L Trailer Sales And Leasing, Inc. ("Sales") gives it priority over $72,900.00 in proceeds from the sale by the Chapter 11 Trustee of five trailers[1] that Sales transferred to K&L Trailer Leasing, Inc. ("Leasing") and for which Defendant First Midwest Equipment Finance Co. ("FMEF") held properly perfected liens.[2]  When the Chapter 11 Trustee sold the five trailers, he paid the proceeds to FMEF, and GFB now seeks to recover those proceeds from FMEF.  Pending before the Court and ripe for decision is GFB's Motion for Summary Judgment ("Motion").

This dispute requires the Court to apply Tennessee's version of Article 9 of the Uniform Commercial Code ("UCC").  The Court applies the law here exactly as it applied it in *Greeneville Federal Bank, FSB v. Fellhoelter* (*In re K&L Trailer Leasing, Inc.*), 630 B.R. 81 (Bankr. E.D. Tenn. 2021) (hereinafter "*GFB I*"), and *Greeneville Federal Bank, FSB v. First Farmers and Commercial Bank* (*In re K&L Trailer Leasing, Inc.*), 665 B.R. 364 (Bankr. E.D. Tenn. Nov. 4, 2024) (hereinafter "*GFB II*").

 Given the undisputed material facts from GFB's Amended Complaint, the Court again concludes that secured transactions principles preserved GFB's properly perfected inventory lien when Sales transferred GFB's collateral to Leasing in transactions that were not in the ordinary course of business such that GFB's security interest in the Subject Trailers had priority over

---

[1] The last four numbers of the VINs for the trailers at issue are: (1) 0661, (2) 2650, (3) 2651, (4) 2652, and (5) 6159 ("Subject Trailers"). [Doc. 19 at ¶ 5; Doc. 19-1 at p. 2.]

[2] Sales sought bankruptcy protection under Chapter 11 on June 29, 2020, and the Chapter 11 Trustee was appointed on July 8, 2020. [*In re K & L Sales And Leasing, Inc.*, No. 3:20-bk-31619-SHB, Doc. 55.]  Leasing also filed its Chapter 11 petition on June 29, and the Chapter 11 Trustee was also appointed on July 8, 2020. [*In re K&L Leasing, Inc.*, No. 3:20-bk-31620-SHB, Doc. 47.]

FMEF's security interest in the same trailers, and that GFB's priority continues in the proceeds from the Chapter 11 Trustee's sale of the Subject Trailers.

## I. PROCEDURAL POSTURE

GFB initiated this proceeding on January 9, 2023. [Doc. 1.]  The next day, the summons was issued by the clerk, and GFB served FMEF on January 19, 2023. [Doc. 5.][3]  FMEF timely filed its initial response to GFB's Complaint in the form of Defendant's Motion to Dismiss Adversary Complaint. [Doc. 9.]  Within the twenty-one days permitted by Federal Rule of Civil Procedure 15(a)(1)(B),[4] GFB amended its complaint on March 9, 2023. [Doc. 19.]  On March 20, 2023, GFB timely responded on agreed extension to FMEF's motion to dismiss. [Docs. 17, 21, 22.]

The Court denied FMEF's motion to dismiss on August 15, 2023. [Doc. 25.]  Under Bankruptcy Rule 7012(a)(6)(A), FMEF's deadline to file an answer to the amended complaint expired on August 29, 2023.  FMEF has *never* filed an answer to the amended complaint.

On November 9, 2023, GFB filed its Motion and supporting documents, including its Statement of Undisputed Material Facts Filed on Behalf of Greeneville Federal Bank, FSB in Support of its Motion for Summary Judgment ("Statement"). [Docs. 28, 29, 30.]  Attached to GFB's Motion, and cited in support of its Statement, is the Affidavit of Lori Parks ("Parks Affidavit"), the GFB employee responsible for administering the loan from GFB to Sales. [Doc.

---

[3] Service on January 19, 2023, was late under Federal Rule of Bankruptcy Procedure 7004(e)(1); however, FMEF waived any defect in service by failing to raise it in its motion to dismiss filed on February 17, 2023 [Doc. 9]. *See* Fed. R. Civ. P. 12(h)(1).

[4] Rule 15 is applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7015.  References herein to "Rule __" mean a Federal Rule of Civil Procedure and to "Bankruptcy Rule __" mean a Federal Rule of Bankruptcy Procedure.

28-1.]  In its Motion, GFB relies on the following documents attached as Exhibits 1 through 9 to

the Parks Affidavit:[5]

(1) Revolving Loan Agreement dated October 1, 2010, and Amendment to Revolving
    Loan Agreement dated October 30, 2012;

(2) Security Agreement dated October 1, 2010 and Intercreditor Agreement dated April
    30, 2015;

(3) UCC-1 Financing Statement dated October 4, 2010, and Financing Statement
    Amendments dated October 1, 2015, and September 2, 2020;

(4) Promissory Note dated October 1, 2010; Modified Promissory Note dated October 1,
    2012; Second Modified Promissory Note dated December 18, 2014; Third Modified
    Promissory Note dated December 16, 2016; and Fourth Modified Promissory Note
    dated August 15, 2019;

(5) five Closing Certificates and Certificates of Incumbency of K&L Trailer Sales &
    Leasing, Inc. dated October 1, 2010; October 30, 2012; December 18, 2014;
    December 16, 2016; and August 15, 2019;

(6) five Closing Certificates and Certificates of Incumbency of K&L Trailer Leasing, Inc.
    dated October 1, 2010; October 30, 2012; December 18, 2014; December 16, 2016;
    and August 15, 2019;

(7) Rule 2004 Examination by Duces Tecum of Michael Webster dated October 2, 2020
    ("Webster Transcript");

(8) a chart of the Subject Trailers and amounts paid to FMEF by the Chapter 11 Trustee;
    and

(9) bills of sale and other documents relating to the Subject Trailers identified in Exhibit
    8. [Docs. 28-1 through 28-10.]

[Docs. 28-2 through 28-10.]

FMEF sought additional time to respond to the Motion, and the Court granted an

extension to January 29, 2024. [Doc. 38.]  On January 4, 2024, Attorney Victoria Ferraro filed a

notice of appearance as counsel for FMEF. [Doc. 40.]  After expiration of the extended deadline

---

[5] Except for the Webster Transcript and the "Closing Certificates and Certificates of Incumbency," GFB's Amended
Complaint included as attachments the same documents that were exhibits to the Parks Affidavit. [*See* Doc. 67 at p.
2.]

to respond to the Motion, FMEF moved for entry of an agreed order to further extend the response time to February 28, 2024, which the Court granted. [Docs. 45, 46.]  On February 28, at FMEF's request, the Court entered an agreed order to stay the adversary proceeding while another of GFB's adversary proceedings was progressing through an appeal and so that the parties could engage in settlement negotiations. [Docs. 49, 50.]

After the appeal was concluded by agreement between those parties, the Court held a status conference in this matter on September 26, 2024, and set a deadline for FMEF's response to the Motion.  FMEF timely responded to the Motion [Doc. 63, 64, 65], and GFB filed its reply brief and response to FMEF's additional statements of undisputed material facts [Docs. 66, 67], making the Motion ripe for adjudication.

## II.  FMEF'S OBJECTIONS TO GFB'S EVIDENCE

The heart of FMEF's opposition to the Motion is based on a threshold evidentiary issue stated in its hyper-technical[6] objections to nearly all of GFB's Statement as follows:

> RESPONSE: Objection. This statement seeks to admit facts based solely upon records submitted through the Affidavit of Lori Parks ("Ms. Parks") when Ms. Parks is not competent to offer testimony to satisfy the minimum requirements to establish herself as a competent witness. Ms. Parks does not have the requisite personal knowledge to testify as to the authenticity of the books and records of . . . GFB[7] and her testimony is inadmissible hearsay that fails to satisfy the requirements of Fed. R. Evid. 801(c), 803(6), and 902(1), (2), and/or (11). Therefore, the fact asserted herein fails to comply with Fed. R. Bank. R. [sic] 7056-

---

[6] Although FMEF may be correct that the Parks Affidavit fails to contain a statement that she is familiar with the record-keeping practices of GFB and that the loan documents exhibited to her affidavit were made and kept in the regular course of GFB's business, this Court has accepted those same loan documents without objection by any other party-in-interest across the two bankruptcy cases and seven related adversary proceedings to which GFB has been a party.  The defect in the Parks Affidavit is easily curable, and the documents clearly would be admissible at an evidentiary hearing.  The most the Court would be inclined to do would be to deny without prejudice the pending Motion to allow GFB to restate it by including the missing evidentiary elements in a new affidavit.  Such would be an inefficient use of judicial resources, not to mention the added cost in legal fees for both GFB and FMEF.  As discussed below, because the Court finds that the allegations of the Amended Complaint have not been answered by FMEF, the Court need not journey down such a wasteful path.

[7] For paragraphs 23 and 24, the repeated objection substitutes the word "Sales" for "GFB." [Doc. 64 at ¶¶ 23-24.]

1[8] and Fed. R. Civ. Pro. 56(c)(4) and should be excluded from consideration. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). . . .

[Doc. 64 at ¶¶ 1-6, 8-17, 19-20, 22, 36-42.]

At times, the repetitious objection is modified slightly,[9] with FMEF asserting:

RESPONSE: Objection. This statement seeks to admit facts based solely upon records submitted through the Affidavit of Lori Parks ("Ms. Parks") when Ms. Parks is not competent to offer testimony to satisfy the minimum requirements to establish herself as a competent witness. Ms. Parks does not have the requisite personal knowledge to testify as[10] to the authenticity of the books and records of *the Tennessee Department of Revenue* [or GFB[11]] and her testimony is inadmissible hearsay that fails to satisfy the requirements of Fed. R. Evid. 801(c), 803(6), and 902(1), (2), and/or (11). *FMEF would further object as the records identified herein were not properly authenticated.*[12]   Therefore, the fact asserted herein fails to comply with Fed. R. Bank. R. [*sic*] 7056-1 and Fed. R. Civ. Pro. 56(c)(4) and should be excluded from consideration. *See Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007). . . .

[Doc. 64 at ¶¶ 18, 21, 25-35.][13]  By these objections, FMEF seeks to preclude the Court's

consideration of the documents on which GFB relies.[14]

---

[8] Presumably, FMEF counsel meant to reference E.D. Tenn. LBR 7056-1, which is a procedural requirement for compliance with Bankruptcy Rule 7056, which incorporates Rule 56 in adversary proceedings.

[9] The Court has italicized the quoted text that is modified.

[10] In paragraphs 26, 28, 30, 32, and 34, the following words are added between the words "testify as" and "to the authenticity": "to the typing on the certificate of origin or." [Doc. 64 at ¶¶ 26, 28, 30, 32, 34.]

[11] The words "or GFB" are not included in paragraphs 21 and 25. [Doc. 64 at ¶¶ 21, 25.]

[12] This clause appears in paragraphs 18, 21, and 25 through 39. [Doc. 64 at ¶¶ 18, 21, 25-39.]

[13] FMEF raises the following additional objection in paragraphs 17, 41, and 42:  "FMEF further objects to this statement as it calls for a legal conclusion upon which Ms. Parks is not competent to testify as the proper foundation for her legal acumen has not been laid to qualify her as an expert on legal matters." [Doc. 64 at ¶¶ 17, 41-42.] Because the Court relies on the admitted allegations of the Amended Complaint, the Court need not address this argument as to the Parks Affidavit.  Similarly, the Court need not address FMEF's objections regarding GFB's reliance on the Webster Transcript. [Doc. 64 at ¶¶ 19, 23, 24.]

[14] FMEF also embeds in its response to GFB's Statement an "objection" under Rule 56(d), stating "FMEF would submit that discovery has not been completed in this matter and additional time is warranted in accordance with Fed. R. Civ. Pro. 56 (d) [*sic*] to further investigate this assertion." [Doc. 64 at ¶¶ 7, 8, 37, 39, 40.]  The Motion was filed in early November 2023, and FMEF chose not to conduct discovery during the intervening nearly eleven months between GFB's filing of the Motion and the status conference held by the Court on September 26, 2024.  Nor did FMEF raise that it needed discovery at that status conference, the very purpose of which was to set a schedule for FMEF's response to the Motion.  Instead, it merely asked for sixty days to respond to the Motion.  Under the circumstances, because FMEF failed to file a Rule 56(d) motion, the embedded "objection" is overruled.

The Court finds that FMEF's failure to answer the Complaint or the Amended Complaint means that the factual allegations therein are not subject to dispute. Although it is exceedingly rare for a court to be asked to enter summary judgment against a defendant who never answered a complaint (because the defendant ordinarily would be subject to entry of default and a motion for default judgment under Rule 55), the Sixth Circuit has long followed the rule that "[o]n motion for summary judgment, no answer having been filed, every allegation of the complaint is to be taken as true." *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947);[15] *see also Rolle Mfg. Co. v. Marco Chems., Inc.*, 92 F. Supp. 218, 220 (D.N.J. 1950) (rejecting the defendant's affidavit in support of its motion for summary judgment because "[n]o answer having been filed by the defendant, the allegations of the complaint must be taken as true"). In *Rogers*, the defendant filed a motion to dismiss, and before the court ruled on that motion, the defendant also filed a motion for summary judgment, later withdrawing the motion to dismiss. *Rogers*, 159 F.2d at 241. The district court granted the summary judgment motion, but the appellate court reversed because no answer had been filed so that the district court was required to take the allegations of the complaint as true. *Id.* Because the allegations of the complaint, even if treated as true, "clearly raised material issues of fact," *id.* at 242, and the appellant had not sought summary judgment (or default) on the unanswered complaint, the appellate court reversed the summary judgment and remanded the case to the district court.

*Rogers* and cases like it present a different procedural posture than here. In those cases, the non-answering defendant filed a motion for summary judgment. Here, by contrast, the non-answering defendant is responding to a motion for summary judgment. Nonetheless, the rule

---

[15] *Rogers* also has been cited for the "clear rule of the Sixth Circuit [that] . . . motions to dismiss and for summary judgment are not 'responsive pleadings' within the meaning of Rule 15(a)." *Union Planters Nat'l Bank v. Harwell* (*In re Harwell*), 80 B.R. 901, 903 (Bankr. W.D. Tenn. 1987).

still applies – because FMEF failed to answer the allegations of GFB's Amended Complaint,

those allegations must be taken as true.  As concerns the Parks Affidavit and the documents that

FMEF now seeks to exclude from consideration on GFB's Motion, the Amended Complaint

alleged as follows:

> 5. [Leasing][16] was in the business of leasing big rig trailers at 7828 Rutledge Pike, Knoxville, Tennessee, and after his appointment the [Chapter 11] Trustee sold the five (5) trailers listed on Exhibit A.[17]
>
> 6.  The [Chapter 11] Trustee then paid to First Midwest $72,900.00 of the net proceeds from the sale of said trailers listed on Exhibit A.
>
> . . . .
>
> 9.  On October 1, 2010, [GFB] made a loan to [Sales] in the sum of $2,500,000.00, secured by virtually all of the assets of [Leasing], including its inventory of new and used trailers, and recorded with the Tennessee Secretary of State the UCC-1, a copy of which is attached hereto as Exhibit B, which was continued by continuations recorded with the Tennessee Secretary of State on October 1, 2015, and September 2, 2020, copies of which is attached hereto as Exhibit C, and which is subject to an Intercreditor Agreement, dated April 30, 2015, with First Peoples Bank of Tennessee ("First Peoples") attached hereto as Exhibit D.
>
> 10. At the time of said loan by [GFB], [Sales] signed a Security Agreement attached hereto as Exhibit E, and it and others also signed a Revolving Loan Agreement attached hereto as Exhibit F, and said Revolving Loan Agreement is subject to an Amendment thereto attached hereto as Exhibit G.
>
> 11. Because [Sales] has, since October 1, 2010, continuously been engaged in the sale of big rig trailers, and because such trailers constitute its inventory, the UCC-1 attached hereto as Exhibit B, has at all times relevant to the allegations contained herein, constituted a blanket inventory lien on all trailers owned by [Sales].
>
> . . . .
>
> 13. Because [Sales] has, since October 1, 2010, continuously been engaged in the sale of big rig trailers, and because such trailers constitute its inventory, the UCC-1 attached hereto as Exhibit B, has at all times relevant to the allegations contained

---

[16] The Court replaces the terms used in the Amended Complaint by the terms of art defined herein and shows the changes with brackets without using ellipses to show missing words.

[17] Because the allegations of the Amended Complaint have been admitted by FMEF's failure to answer, the exhibits are also admitted and proper for the Court's consideration in connection with the Motion.

herein, constituted a blanket inventory lien on all trailers owned by [Sales] and has survived the transfer of any trailer to any transferee of [Sales] who was not a "buyer in the ordinary course of business" as defined in T.C.A. §47-1-201(9), and is superior to any lien obtained by any lender from a transferee who was not a "buyer in the ordinary cause of business" from [Sales] since only a "buyer in the ordinary course of business" takes free of a blanket inventory lien in accordance with T.C.A. §47-9-320.[18]

14. At all times relevant to the allegations contained herein, Kris Fellhoelter has been the sole owner of [Sales], and its President, as well as simultaneously the fifty percent (50%) owner of all of the outstanding stock and President of [Leasing].

15. At all times relevant to the allegations contained herein, Kris Fellhoelter's parents, Marvin Fellhoelter and Linda Fellhoelter, have been collectively the owners of fifty percent (50%) of the outstanding stock of [Leasing], were officers and members of the Board of Directors of [Leasing], and were also active employees of [Sales] and [Leasing].

16. At all times material to the allegations contained herein, [Leasing] and [Sales] shared other officers and employees, and [Sales] paid the full salaries of some of those common officers and employees.

17. At all times material to the allegations contained herein, Kris Fellhoelter and Marvin Fellhoelter and Linda Fellhoelter, and consequently [Leasing] were fully aware of the terms of the security interest of [GFB] in all trailers of [Sales] and the obligation of [Sales] to make payment to [GFB] in order to obtain a release of [GFB's] security interest in any trailer transferred by said [Sales].

18. To the extent that trailers were transferred from [Sales] to [Leasing] in a transaction for which [GFB] did not release its security interest in the trailer, the transferee thereof with such knowledge was not a "buyer in the ordinary cause of business," as defined in T.C.A. §47-1-201(9), and consequently the transferee obtained the trailer subject to the unreleased blanket inventory lien and security interest of [GFB], as did any lender claiming a security interest therein from that transferee. (See T.C.A. §47-9-320).

19. The trailers identified on Exhibit A and transferred by [Sales] to [Leasing] were transfers for which [GFB] did not release the security interest of its blanket recorded inventory lien, and for which it did not receive payment from anyone for the release of its security interest, all of which was within the knowledge of said transferee ([Leasing]).

20. The fact that transfers were made by [Sales] to [Leasing] without procuring a release from [GFB] of its security interest in those trailers was known to Kris

---

[18] The Court notes that this paragraph and paragraphs 18 and 21 contain, in part, conclusions of law so that even though the allegations of the Amended Complaint are admitted by FMEF's failure to answer them, the legal conclusions will be addressed herein.

Fellhoelter, the President of [Leasing], and consequently was within the knowledge of [Leasing], and for which reason [Leasing] was not a "buyer in the ordinary course of business," and by reason of which it took ownership thereof subject to the existing security interest of [GFB] in those trailers in which it did not specifically release its security interest.

21. That for each of the specific trailers referred to hereinafter that were transferred by [Sales] to [Leasing] who then pledged those trailers to [FMEF], [FMEF] knew or should have known that [Leasing] [as] transferee was not a "buyer in the ordinary course of business," and it then had a duty to see that the recorded security interest of [GFB] in that particular trailer was released, and if it was not, then that [FMEF's] security interest in that trailer is junior and subordinate to the recorded blanket inventory security interest of [GFB] in each such trailer.

22. The documents attached hereto as Exhibit H document that each of the trailers listed on Exhibit A were transferred from [Sales] to [Leasing] subsequent to October 1, 2010.

[Doc. 19 at pp. 2-7.]

### III.  FACTS[19]

On October 1, 2010, a Revolving Loan Agreement was executed between GFB and Sales, through which GFB issued a floor-plan line of credit to Sales for its big rig trailers. [Doc. 19-6.] The following insiders[20] signed as guarantors:  Leasing; Fellhoelter Enterprises, LLC; Kris and Amy Fellhoelter; and Marvin and Linda Fellhoelter.[21] [*Id.* at p. 19.]  Additionally, under the Security Agreement between GFB and Sales, also dated October 1, 2010 (which incorporated by reference the Revolving Loan Agreement), GFB was granted a security interest in virtually all

---

[19] The following facts cannot be disputed by FMEF because they were contained in the Amended Complaint or its exhibits or for other reasons explained by the Court below.

[20] Each person identified meets the definition of "insider" in 11 U.S.C. § 101(31).

[21] At all times relevant to this adversary proceeding, Leasing was a Tennessee corporation in the business of leasing big rig trailers. [Doc. 19 at ¶ 5.]  Both Leasing and Sales maintained a place of business at 7828 Rutledge Pike in Knoxville, Tennessee, and Kris Fellhoelter, who owned 100% of the outstanding stock in Sales and 50% of the outstanding stock in Leasing, was President of both companies. [Doc. 19 at ¶¶ 5, 14, 20; Doc. 19-6 at p. 2.]  Leasing, through Kris Fellhoelter; Fellhoelter Enterprises, Inc.; and each of the Fellhoelters who executed the Revolving Loan Agreement did so "for the purpose of acknowledging and consenting to the terms and provisions [thereof]." [Doc. 19-6 at p. 17.]

assets of Sales, including but not limited to all current and after-acquired inventory. [Doc. 19-5.] On October 4, 2010, GFB filed with the Tennessee Secretary of State a UCC-1 Financing Statement reflecting the security interest that has been continuously retained[22] in "[a]ny and all personal property of [Sales], tangible and intangible, including without limitation, equipment, inventory, accounts receivable, contract rights, general intangibles and all other personal property of [Sales]." [Doc. 19-2 at p. 2.]

Concerning the collateral, the Security Agreement states, in material part:

Covenants as to the Collateral.  So long as any of the Obligations shall remain outstanding, unless Bank shall otherwise consent in writing:

. . . .

(f) Transfers and Other Liens.  Without the prior written consent of Bank, the Grantor will not (i) sell, assign (by operation of law or otherwise), exchange, or otherwise dispose of any of the Collateral (except for sale or other use of inventory in the ordinary course of business); or (ii) create or suffer to exist any lien, security interest or other charge or encumbrance upon or with respect to any of the Collateral except for the security interest created by this Agreement and except for any security interest specifically disclosed in Exhibit "A," attached hereto.

[Doc. 19-5 at pp. 4, 6.]

With respect to amendments or modifications, the Revolving Loan Agreement expressly states that "[t]he provisions of this Loan Agreement, the Note, or any other instrument or document now or hereafter securing the Obligations may be amended or modified only by an instrument in writing signed by the parties hereto." [Doc. 19-6 at ¶ 7.1.]  Correspondingly, the Security Agreement provides the following with respect to amendments:

(a) No amendment of any provision of this Security Agreement shall be effective unless it is in writing signed by the Grantor and the Bank, and no waiver of any provision of this Agreement, and no consent to any departure by the Grantor therefrom, shall be effective unless it is in writing and signed by the Bank, and then such waiver or consent shall be effective only in the specific instance and for the

---

[22] Continuation statements of the UCC-1 were recorded on October 1, 2015, and September 2, 2020. [Doc. 19-3.]

specific purpose for which given.

   (b) No failure on the part of the Bank to exercise, and no delay in exercising, any right hereunder or any other instrument or document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right . . . .

[Doc. 19-5 at ¶¶ 13(a), (b).]  The Security Agreement also specified that all terms used therein "are defined in the Loan Agreement or in Article 9 of the [UCC] . . . of Tennessee, as now or hereafter in effect, and which are not otherwise defined herein shall have the same meanings herein as set forth therein." [*Id.* at ¶ 1(a).]

The Subject Trailers were transferred by Sales to Leasing without GFB releasing its inventory security interest and without payment to GFB. [Doc. 19 at ¶ 19.]  Leasing, through its president, Kris Fellhoelter, was aware that GFB did not receive payment for the Subject Trailers when they were transferred from Sales. [*Id.* at ¶¶ 19-20.]

FMEF holds an Equipment Financing Agreement dated March 31, 2015 ("EFA-1"), on which Leasing is obligated. [Doc. 65 at ¶ 1; Doc. 66 at ¶ 1.]  The EFA-1 concerned the original financed amount of $111,350.00 from FMEF's assignor National Machine Tool Financial Corporation to Leasing. [*Id.*]  On October 15, 2015, Leasing became indebted to FMEF for an additional $72,000.00 as shown by the Equipment Financing Agreement dated October 15, 2015 ("EFA-2"). [*Id.* at ¶ 4.]  Kris Fellhoelter executed both the EFA-1 and the EFA-2 as President of Leasing. [Doc. 64-2 at pp. 3, 6.]  Notably, Sales (through Kris Fellhoelter)[23] executed Guaranties for Leasing's debt under both the EFA-1 and the EFA-2. [FMEF Claim No. 39-1 Part 2 at pp. 5,

---

[23] Kris Fellhoelter, individually, also signed as guarantor of Leasing's debt to FMEF from the EFA-1 and the EFA-2. [FMEF Claim No. 39-1 Part 2 at pp. 4, 32, *In re K & L Trailer Sales and Leasing, Inc.*, No. 3:20-bk-31619-SHB (Sept. 21, 2020); FMEF Claim No. 17-1 Part 2 at pp. 5, 24, *In re K & L Trailer Sales and Leasing, Inc.*, No. 3:20-bk-31620-SHB (Aug. 20, 2020).]  The Court takes judicial notice of FMEF's proofs of claim filed in the Sales and the Leasing bankruptcy cases. *See* Fed. R. Evid. 201.

14, *In re K & L Trailer Sales and Leasing, Inc.*, No. 3:20-bk-31619-SHB (Sept. 21, 2020);

FMEF Claim No. 17-1 Part 2 at pp. 6, 26, *In re K&L Trailer Leasing, Inc.*, No. 3:20-bk-31620-

SHB (Aug. 20, 2020).[24]]

FMEF "disputes" GFB's assertions that FMEF's lien as to Leasing on the Subject

Trailers "was typed on the certificate of origin for [each] trailer initially issued to Sales" and that

the certificates of origin reflect that the Subject Trailers were conveyed by Sales to Leasing.

[Doc. 64 at ¶¶ 26, 28, 30, 32, 34.]  FMEF supplied copies of the certificates of title for each of

the Subject Trailers, all of which reflect its lien. [Doc. 64-2 at pp. 9-13.]  Under Federal Rule of

Evidence 807, the Court overrules FMEF's objection to Exhibit 9 to the Parks Affidavit, finding

sufficient guarantees of trustworthiness under the totality of the circumstances, including that

FMEF's evidence corroborates Exhibit 9 to the Parks Affidavit as shown in this chart:

| VIN last 4 | Acquired Date on Title[25] | Title Issue Date | Bill of Sale Date[26] | Certificate of Origin[27] Rec'd Date |
|---|---|---|---|---|
| 0661 | 10/7/2015 | 11/6/2015 | 10/7/2015 | 11/6/2015 |
| 2650 | 3/30/2015 | 4/2/2015 | 3/30/2015 | None |
| 2651 | 3/30/2015 | 4/2/2015 | 3/30/2015 | None |
| 2652 | 3/30/2015 | 4/2/2015 | 3/30/2015 | None |
| 6159 | 10/7/2015 | 11/10/2015 | 10/7/2015 | 11/10/2015 |

This evidence (and FMEF's claims filed in the Sales and Leasing bankruptcy cases)

establish that FMEF knew that Sales transferred the Subject Trailers to Leasing.  Indeed,

FMEF's claim in the Leasing bankruptcy cases and FMEF's own exhibits attached to the

---

[24] Notably, FMEF did not attach either of the Guaranties by Sales to the Affidavit of Regina Miller for its response to the Motion.

[25] The acquired date and title issuance date are reflected on the certificates of title supplied by FEMF.  [*See* Doc. 64-2 at pp. 9-13.]

[26] The sale date is reflected on the trailer invoices included in Exhibit 9 to the Parks Affidavit [Doc. 28-10 at pp. 4, 8, 13, 18, 22], and two of the certificates of origin reflect a date-stamp "received" [*id.* at pp. 6, 20].

[27] Each of the certificates of origin includes FMEF's assignor as the lienholder. [*Id.* at pp. 6, 10, 15, 20, 24.]

Affidavit of Regina Miller include two UCC-1 Financing Statements naming *Sales* as the

"Debtor" (perhaps because Sales had guaranteed the debt of Leasing) and identifying as

"collateral" the three of the Subject Trailers[28] even though Sales had transferred ownership of

those trailers to Leasing as shown on the certificates of origin. [FMEF Claim No. 17-1 Part 2 at

p. 8, *In re K&L Trailer Leasing, Inc.*, No. 3:20-bk-31620-SHB (Aug. 20, 2020); Doc. 64-2 at p.

7; Doc. 28-10 at pp. 9-10, 14-15, 23-24.]

This evidence establishes indisputably that FMEF had knowledge that the Subject

Trailers were transferred from Sales to Leasing.

## IV.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law[,]" utilizing the procedures for Rule 56(c) (applicable in

adversary proceedings through Bankruptcy Rule 7056).  The Court does not weigh the evidence

to determine the truth of the matter asserted when deciding a motion for summary judgment but

simply determines whether a genuine issue for trial exists.  *See Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 249 (1986).  "Only disputes over facts that might affect the outcome of the suit

under the governing law will properly preclude the entry of summary judgment." *Id.*

The movant bears the burden of proving that summary judgment is appropriate by

establishing that there is no genuine dispute concerning any material fact, such that any claim or

defense alleged is factually unsupported.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24

(1986).  Once the initial burden is met, the nonmoving party must raise a genuine dispute of

material fact for trial and may not rely solely on allegations or denials contained in the pleadings.

---

[28] The other two of the Subject Trailers were listed as collateral on the UCC-1 filed by FMEF's assignor with Leasing identified as "Debtor." [FMEF Claim No. 17-1 Part 2 at p. 36, *In re K&L Trailer Leasing, Inc.*, No. 3:20-bk-31620-SHB (Aug. 20, 2020); Doc. 64-2 at p. 8.]

*See Nye v. CSX Transp., Inc.*, 437 F.3d 556, 563 (6th Cir. 2006) (holding that reliance on a "mere scintilla of evidence in support of the nonmoving party will not be sufficient"); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The facts and all resulting inferences are viewed in a light most favorable to the nonmoving party, and the Court must decide whether "the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 243.  "A genuine issue of material fact exists when 'there is sufficient evidence favoring the nonmoving party for a [fact-finder] to return a verdict for that party.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (quoting *Anderson*, 477 U.S. at 249).  Nevertheless, when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citations omitted).

## V.  THE PARTIES' POSITIONS

GFB relies on this Court's decision in *GFB I* and *GFB II*.  FMEF asserts that material issues of fact exist to preclude summary judgment for GFB, arguing that the ordinary course of business for Sales was to sell the new trailers by transferring the certificates of origin to a purchaser with notation of the lien of the purchaser's lender. [Doc. 63 at p. 7.]  Thus, FMEF contends:

> [A] material question remains if FMEF actually had any duty to review the 'source of title' as alleged in GSB's [*sic*] Motion and also, given the normal course of business for Sales, it begs the question of whether at the time of the transaction with FMEF, if the transfer was done as a buyer in the ordinary course of business pursuant to Tenn. Code Ann. §47-1-201(9).  Sales was in the business of selling trailers; there is a question of fact if the transfer was made in good faith, and was made without knowledge of any violation of rights.

[*Id.* at pp. 7-8.]

FMEF also maintains that it held a properly perfected purchase-money-security-interest

("PMSI") in the Subject Trailers for the funds it loaned to Leasing to purchase the trailers. [*Id.* at

pp. 8-9.]  It then claims that such a PMSI takes priority over GFB's inventory lien "because the

trailers were no longer 'inventory' when FMEF filed and perfected its direct lien on" the Subject

Trailers. [*Id.* at p. 9.]

## VI.  ANALYSIS[29]

The starting point for the Court's determination about the perfection and priority issues is

the UCC as adopted in Tennessee.  As the Court explained in *GFB I*:

> Under Tennessee law, GFB's only method of perfecting its lien on the
> inventory of Sales was by the filing of a financing statement. *See* Tenn. Code Ann.
> § 47-9-311(d) (providing that when collateral that is governed by a certificate-of-
> title statute is inventory held for sale or lease by a person who is in the business of
> selling goods of that kind, the requirements of the certificate-of-title statute do not
> apply).  Indeed, comment 4 to section 47-9-311 explains that "[c]ompliance with
> the certificate-of-title statute is both unnecessary and ineffective to perfect a
> security interest in inventory to which this subsection applies."  Tenn. Code Ann.
> § 47-9-311 cmt. 4.  Thus, GFB's security interest in the trailer-inventory of Sales
> was continuously perfected from the date that GFB filed the UCC-1.

*GFB I*, 630 B.R. at 87.

The general rule concerning disposition of collateral contrary to a secured party's security

interest is found at Tennessee Code Annotated section 47-9-315(a), which provides:

> Except as otherwise provided in this chapter and in § 47-2-403(2):
>
> (1)  a security interest or agricultural lien continues in collateral
> notwithstanding sale, lease, license, exchange, or other disposition thereof unless
> the secured party authorized the disposition free of the security interest or
> agricultural lien; and
>
> (2) a security interest attaches to any identifiable proceeds of collateral.

---

[29] Much of the remainder of this opinion is repeated from *GFB II*.  Because FMEF was not a party to that adversary
proceeding, the Court reiterates its analysis here; however, the explanation of priority as between an inventory
lienholder and a PMSI lienholder over the same collateral of the same debtor is new.

Section 47-9-507(a) coordinates with section 47-9-315(a) to make clear that the secured party's

perfection is uninterrupted by disposition of the collateral when section 47-9-315(a) applies to

continue the security interest:  "A filed financing statement remains effective with respect to

collateral that is sold, exchanged, leased, licensed, or otherwise disposed of and in which a

security interest or agricultural lien continues, even if the secured party knows of or consents to

the disposition." Tenn. Code Ann. § 47-9-507(a).  As explained by comment 3, the secured party

retains its perfected lien after transfer even if the collateral is "owned by a person other than the

debtor against whom the financing statement was filed."  Tenn. Code Ann. § 47-9-507 cmt. 3.

To be sure, secured transactions principles provide exceptions to the general rule that a

perfected security interest remains attached to and perfected in collateral that is transferred by the

secured party's debtor.

> First, if chapter 9 of title 47 provides some exception to the general rule, then a
> perfected security interest will not continue in collateral disposed of by a debtor.
> Tenn. Code Ann. § 47-9-315(a).  Second, if a secured party entrusts goods subject
> to the creditor's security interest to a merchant who deals in goods of that kind, the
> merchant has the power to transfer all rights of the creditor "to a buyer in the
> ordinary course of business." Tenn. Code Ann. § 47-2-403(2), *cited in* Tenn. Code
> Ann. § 47-9-315(a).   Third, if a secured party authorizes the disposition of its
> collateral free of the security interest, then that disposition terminates the security
> interest in that collateral. Tenn. Code Ann. § 47-9-31[5](a)(1).

*GFB I*, 630 B.R. at 87-88.

Tennessee Code Annotated section 47-9-311(d) provides:

> INAPPLICABILITY TO CERTAIN INVENTORY. During any period in which
> collateral subject to a statute specified in subdivision (a)(2) is inventory held for
> sale or lease by a person or leased by that person as lessor and that person is in the
> business of selling goods of that kind, this section does not apply to a security
> interest in that collateral created by that person.

Subsection (d) is an exception to the rule in subsection (a)(2)(A) that perfection of a security

interest in collateral that is subject to the state's certificate-of-title laws requires compliance with

those laws (mandating perfection by notation on the collateral's certificate of title).  This is

because the UCC scheme provides that perfection of a security interest in inventory is accomplished solely by filing a UCC-1 financing statement. *See* Tenn. Code Ann. § 47-9-312(a); Tenn. Code Ann. § 47-9-311 cmt. 4 ("Compliance with [the] certificate-of-title statute is both unnecessary and ineffective to perfect a security interest in inventory to which this subsection applies.").

FMEF argues that "the trailers were no longer 'inventory' when FMEF filed and perfected its direct lien on the subject trailers." [Doc. 63 at p. 9.]  This is the same argument raised by Leasing's creditors in *GFB I* and *GFB II* that section 47-9-311(d) applied to strip GFB of its security interest in the Subject Trailers because *Leasing* did not hold them for sale.  Such an argument jumps over and wholly misapplies the foundational protections of secured parties under Article 9 when collateral is disposed of by a debtor and no exception applies to allow the disposition to be free of the security interest created by the debtor.

The following hypothetical, which removes the relatedness of the transferor and transferee present here, is instructive.  Assume that an inventory seller of trailers (Transferor) transfers trailer inventory to a trucking company (Transferee) that holds and uses the trailers as equipment for its transportation business.  The trailers, however, were subject to the inventory lien given by Transferor to Bank A, properly perfected by the filing of a UCC-1 financing statement.  Next, assume that the facts show that the transfer of Bank A's collateral to Transferee was not in the ordinary course of business for whatever reason (say, for example, because the owner of Transferee threatened the owner of Transferor and no consideration was exchanged (except that Transferor's owner escaped without bodily injury)).  In such a circumstance, Transferee would take the collateral subject to the security interest of Bank A.  This is so because section 47-9-315(a)(1) says it is so.  If Transferee obtained funds from Bank Z by offering the transferred trailers as collateral and if Bank Z noted its lien on the certificates of title for the

transferred trailers, those trailers nonetheless would remain subject to Bank A's perfected inventory lien. That is, the transfer (not in the ordinary course) of the trailers to Transferee that is not in the business of selling trailers would not strip Bank A of its perfected inventory lien. This is so even though Bank Z is perfected by notation of its lien on the certificates of title. Bank Z has a properly perfected security interest in the trailers, but it is subject to the earlier perfected security interest of Bank A.[30]

FMEF's argument applied to our hypothetical facts would mean that an inventory lien would not survive the transfer even if the sale was not to a buyer in the ordinary course. The argument misunderstands the law and seems to conflate the two distinct questions of how to perfect inventory that is subject to the state's certificate-of-title law and what happens when property is transferred in contravention of the rights of secured parties under the UCC.

Under the facts here, only two exceptions could exist to change the general rule that a perfected security interest continues in collateral that is transferred: (1) sale of inventory to a buyer in the ordinary course of business under section 47-2-403(2), as expressly referenced in section 47-9-315(a), or (2) the secured party's authorization of the disposition free of the security interest under section 47-9-315(a)(1).

GFB argues that the first exception does not apply because the transfers of the Subject Trailers by Sales to Leasing were not to a buyer in the ordinary course of business under section 47-2-403(2). Section 47-2-403(3) defines "entrusting" as an exception to the general rule found in section 47-2-403(1) that a transfer of goods subject to an Article 9 lien transfers to the

---

[30] Doubtlessly, if Transferee had purchased the trailers in the ordinary course of business, then Transferee would have taken the trailers free of Bank A's lien as provided in sections 47-2-403(2) and 47-9-315(a) – but under the principles of Article 9 and not because Transferee is not in the business of selling trailers. In such a case, then Bank Z's security interest perfected by notation on the certificates of title would be first, and Bank A would have no interest in the transferred trailers; instead, Bank A's only security interest would be in identifiable proceeds of the collateral, as provided in section 47-9-315(a)(2).

transferee only the rights of the transferor in the goods.  Under section 47-2-403(2), when a

secured party entrusts its collateral consisting of goods to a merchant who deals in goods of that

kind, the merchant has the power to transfer all the rights of the entruster to a buyer in the

ordinary course of business.  Similarly, section 47-9-320 provides that "a buyer in the ordinary

course . . . takes free of a security interest created by the buyer's seller, even if the security

interest is perfected and the buyer knows of its existence."

> Importantly, "buyer in the ordinary course of business" is defined by the UCC:
>
> "Buyer in the ordinary course of business" means a person that buys goods [1] in
> good faith, [2] without knowledge that the sale violates the rights of another person
> in the goods, and [3] in the ordinary course from a person . . . in the business of
> selling goods of that kind. A person buys goods in the ordinary course if the sale to
> the person comports with the usual or customary practices in the kind of business
> in which the seller is engaged or with the seller's own usual or customary practices.
> . . .

Tenn. Code Ann. § 47-1-201(9).  GFB relies solely on the second element that requires a buyer

in the ordinary course to buy "without knowledge that the sale violates the rights of another

person in the goods." *Id.*

Operation of these statutes is illustrated by numerous cases over the past sixty years.  For

example, in *Taylor Motor Rental, Inc. v. Associates Discount Corporation*, 173 A.2d 688 (Pa.

Super. Ct. 1961), the plaintiff, a purchaser of a car from a car dealer, sued the dealer's lender that

held a security interest in all of the dealer's inventory. The owner of the car dealer was also an

officer and stockholder of the plaintiff-purchaser, and the owner also kept the dealership's books

and records and signed the dealership's checks, generally conducting the affairs of the

dealership.  *Id.* at 689-90.  The car at issue was kept in a building that was shared by the

dealership and the plaintiff-purchaser.  *Id.*  The court affirmed the trial court's holding:

> It is clear that plaintiff was not a buyer in the ordinary course of business as
> defined by the Commercial Code.  Both the relationship of plaintiff and [the
> dealership], with their interlocking officers, shareholders and employees and the

fact that both plaintiff corporation and [the dealership] were managed by [the same person] negates this.

*Id.* at 690.

In 1983, the bankruptcy court for the Western District of Texas held that a transfer of inventory from one corporation to a related corporation was not a sale in the ordinary course of business. *First State Bank of Corpus Christi v. Del Tex Corp.* (*In re Del Tex Corp.*), 32 B.R. 403 (Bankr. W.D. Tex. 1983).  The secured lender had loaned funds to South Texas, an affiliated entity[31] of Del Tex, the debtor in the bankruptcy case, and the secured lender claimed that it was a secured creditor of Del Tex. *Id.* at 404.  The parent company caused transfers of inventory from South Texas to Del Tex. *Id.*  Stating the issue as "whether the Bank's security interest over South Texas' inventory survived the purported sale to Del Tex and is enforceable against Del Tex," *id.* at 405, the court rejected Del Tex's argument that the security agreement authorized South Texas to sell the bank's collateral. *Id.* at 406.  The court applied the UCC provision that is now section 9-315(a) to determine that the court was required to enforce the security agreement between the bank and South Texas, "particularly the usage and meaning of the term 'inventory', which the Court finds to be the chief operative term in the grant of authority" to sell the bank's collateral. *Id.*  The court reviewed the facts to find that the transfers from South Texas to Del Tex were not sales in the ordinary course of South Texas's business, primarily because the parent company had failed to maintain the separateness of the two companies so that "the nature of the management . . . reached the point that they cannot be considered to be dealing at arms length with each other." *Id.* at 407.  The court concluded that "the transfers . . . cannot be treated as sales in the ordinary course of business, but merely a shifting of assets between non-distinct entities." *Id.*  The result was that the bank was a secured creditor of Del Tex to the extent of the

---

[31] South Texas and Del Tex were owned by the same parent company. *Id.* at 404.

value of the bank's collateral that was held by Del Tex after the transfer from South Texas. *Id*. at
408.

  Two years later, the Supreme Court of Nevada held that a mobile home that a secured
lender's debtor had sold to an individual was transferred subject to the lender's security interest
in inventory. *Homes Sav. Ass'n v. Gen. Elec. Credit Corp.*, 708 P.2d 280 (Nev. 1985).  The
mobile home dealer gave an inventory lien to GECC, which properly perfected its lien. *Id*. at
282.  When the dealer sold a mobile home to a consumer, the dealer would execute an
installment sales contract and a security agreement with the consumer and assign its rights to
Home Savings Association ("HSA"), which would pay the dealer the purchase price less the
consumer's down payment. *Id.*  HSA then obtained the title to the mobile home with its lien
noted. *Id.*  One of the mobile homes at issue in the litigation had been sold to a customer, but the
customer had never made a down payment. *Id.* at 286.  The evidence showed that the "deal fell
through" and the customer did not take possession of the mobile home. *Id.*  At the time that
GECC repossessed the mobile home, it was on a residential site, not on the dealer's sales lot. *Id.*
The court held that there had been no buyer and, thus, no buyer in the ordinary course. *Id.*
Notably, the court so held even though the mobile home was no longer being possessed and
offered for sale by the dealer. *Id.*

  In a situation very similar to the facts here, in 1993, the bankruptcy court for the Southern
District of Ohio held for the floor-plan financier over the holder of a PMSI in a tractor that had
been purchased by the debtors and repossessed by the floor-plan lender. *Bank One, Portsmouth,
N.A. v. Dettwiler* (*In re Dettwiler*), 156 B.R. 540 (Bankr. S.D. Ohio 1993).  The individual
chapter 11 debtors and their son owned a tractor dealership that sold Kubota tractors, with
Kubota retaining a properly perfected security interest in all equipment and inventory of the
dealership. *Id.* at 541-42.  The tractor at issue was purchased from the dealership by one of the

debtors who "intended to lease the tractor to area farmers and had discussed this course of action

with Kubota's representative." *Id.* at 542.  He paid a portion of the purchase price from his own

funds and financed the rest of the purchase from the plaintiff, Bank One, which perfected its

security interest. *Id.*  "The tractor remained on the premises of the [d]ealership.  The [d]ealership

did not inform Kubota of the sale." *Id.*  The court held that the sale was not in the ordinary

course of business because the debtor "did not act in good faith [and] . . . he knew that a sale

without remitting the proceeds to Kubota violated the [security] [a]greement." *Id.* at 543.

The *Dettwiller* court acknowledged that "several courts have held that principals

purchasing goods from corporations they control are not buyers in the ordinary course of

business." *Id.* at 544 (citing *In re Palmer*, 103 B.R. 348 (Bankr. M.D. Ga. 1989); *Transam.*

*Comm. Fin. Corp. v. Union Bank & Tr. Co.*, 584 So. 2d 1299 (Ala. 1991); *Merchants & Planters*

*Bank & Tr. Co. of Arkadelphia v. Phoenix Hous. Sys., Inc.* 729 S.W.2d 433 (Ark. Ct. App.

1987); *In re Del Tex Corp.*, 32 B.R. at 407).  The competing creditor in *Dettwiller* argued that

Kubota authorized the sale of the tractor, treating the argument as a separate ground for stripping

Kubota of its inventory lien. *Id.* at 544-45.  The court rejected the argument by reference to

Kubota's and the dealership's security agreement, which prohibited disposition of Kubota's

collateral except in the ordinary course of business. *Id.* at 545.

Finally, the *Dettwiller* court found that Kubota should win on policy grounds.

In this contest between Kubota and plaintiff, it is appropriate that plaintiff should
bear the loss. . . .  The policy of the buyer in the ordinary course exception to the
primacy of the inventory lender's lien is rooted in commercial expediency.
Requiring good faith retail purchasers in the ordinary course to search for
encumbrances on purchased items is impractical and cumbersome. . . .  The buyer
in the ordinary course of business doctrine "encourage[s] the marketability of goods
and support[s] the reliance interest of buyers in the ordinary course who assume
that they have clear title to the goods they purchase."

Those principles ought not to avail this plaintiff, *a lender to an insider buyer*
*which seeks to prime the lien of Kubota, a prior and properly perfected inventory*

*lender*.  Kubota did all it could have been expected to do to protect its security interest.  It properly and timely filed a UCC-1 financing statement and continuation of same. . . .   Moreover, Kubota[] . . . states that it did not learn of the sale of the tractor until after debtors had filed their bankruptcy petition.  This lack of notice is consistent with the debtors' failure to remove the tractor from the dealership premises after the purchase,[32] thereby concealing from Kubota the fact that the tractor had been purchased.

*Id.* (emphasis added) (citations omitted).

Also instructive is the more recent case of *Automotive Finance Corporation v. DZ Motors, LLC*, 104 UCC Rep. Serv. 2d 740, No. 16-7955, 2021 WL 1380605 (D.N.J. Apr. 9, 2021).  There, the floor-plan lender sued a credit union that had financed a sham sale to the then-wife of the car dealership's owner. *Id.* at *5.  The court parsed through the evidence concerning whether the sale of a Bentley to the dealer's owner was legitimate and determined that if the owner of the dealership or his wife had been buyers in the ordinary course, either could have taken the car free of the inventory lienholder's UCC lien. *Id.* at *12.  Likewise, a lender that financed such a purchase would be able to defeat the inventory lien. *Id.*  Nonetheless, the court held the following:[33]

On this record, there can be no serious contention that the Zholobovs were in any sense buyers in the ordinary course. *Accord with Martin Marietta Corp. v. N.J. Nat'l Bank*, 612 F.2d 745, 751 (3d Cir. 1979) ("[I]f the sale was a sham to avoid the seller's obligation to his creditor, then it probably would not satisfy . . . the buyer in the ordinary course requirement"); *Taylor Motor Rental*, 173 A.2d at 690 (rejecting an assertion that plaintiff was a buyer in the ordinary course where the operator of the dealership acted for both the dealership and the purported buyer "in applying for the certificate of title in the name of the plaintiff. The purported sale by seller to the plaintiff [buyer] was merely a paper transaction for the benefit

---

[32] Although GFB has not raised the point and it is not material to the Court's analysis, the record establishes that Sales and Leasing shared one address, which presumably means that the Subject Trailers remained on the Sales property mixed with other trailers held for sale or leasing by Sales and for leasing by Leasing.

[33] Though this Court acknowledges that much of the *DZ Motors* opinion concerns whether the vehicle remained for sale by the dealership after the purported sale, that analysis does not support any argument here that GFB lost its perfected inventory lien because Leasing was not in the business of selling trailers. It is immaterial that Leasing was not in the business of selling trailers because under section 47-9-315(a), GFB's inventory lien continued in the Subject Trailers unless they were sold to Leasing *as a statutorily defined  buyer in the ordinary course of business*.

of [seller], who now has possession of the automobile for which defendant has
never been paid.").

*Id.*

Other of Leasing's creditors who have disputed the priority of GFB's inventory lien on
collateral transferred to Leasing have attempted to rely on section 47-9-320[34] to assert that Kris
Fellhoelter's knowledge of GFB's security interest does not prevent Leasing from taking trailers
free of that interest.  As previously explained, such an argument conflates two provisions of the
UCC.  Certainly, knowledge of a perfected security interest does not prevent a buyer from being
a buyer in the ordinary course of business, but a buyer may not be a buyer in the ordinary course
of business unless the buyer is "without knowledge that the sale violates the rights of another
person in the goods." Tenn. Code Ann. § 47-1-201(9).

Thus, the foundational question here is whether GFB has presented undisputed facts to
establish that Leasing was not a buyer in the ordinary course of business in light of the statutory
definition and the provisions of the Security Agreement and Revolving Loan Agreement between
Sales and GFB.  FMEF asserts that there is an issue of fact as to whether "the transfer was made
in good faith, and was made without knowledge of any violation of rights."  [Doc. 63 at p. 8.]
To the contrary, the Court finds that the undisputed facts – namely, the Security Agreement and
Revolving Loan Agreement – are unambiguous concerning GFB's rights and Sales's obligations
and establish that Leasing was not a buyer of the Subject Trailers in the ordinary course of
business.

The Revolving Loan Agreement and Security Agreement between GFB and Sales were
signed by Kris Fellhoelter, who was the general manager of both Sales and Leasing.  Kris
Fellhoelter also signed the certificates of origin to transfer ownership of three of the Subject

---

[34] Section 47-9-320(a) provides, in material part, that a "buyer in the ordinary course of business . . . takes free of a
security interest created by the buyer's seller, even if the security interest is perfected and the buyer knows of its
existence."

Trailers from Sales to Leasing [Doc. 28-10 at pp. 10, 15, 24], and Linda Fellhoelter (also an insider) signed a fourth [*id.* at 6]. The Revolving Loan Agreement and Security Agreement contain numerous provisions to protect GFB's lien in Sales's inventory. GFB even procured the signatures of Kris Fellhoelter, individually and as President of Leasing (along with other officers of Sales and Leasing), to acknowledge his awareness of the terms of the Revolving Loan Agreement and Security Agreement. The Security Agreement requires the express written consent of GFB for Sales to dispose of any of GFB's collateral other than by a sale of inventory in the ordinary course of business. The Security Agreement also contains a provision against any waiver of GFB's rights by any failure of GFB to exercise or delay in exercising any right. Presumably because of the relationship between Sales and Leasing and their owners, the Revolving Loan Agreement (which was incorporated into the Security Agreement) defined "Ordinary Course of Business" and expressly authorized an "occasional sale" of inventory to another dealer, but only if the other dealer "is not a Related Person" [Doc. 19-2 at 23], which is also defined to clearly include Leasing and Kris Fellhoelter.[35] [*See* Doc. 19-2 at 24.]

---

[35] Exhibit A to the Revolving Loan Agreement entitled "Definitions and Accounting Terms" includes the following definitions:

"Ordinary Course of Business" as applied to sales of Inventory of the Borrower shall mean (a) a bona fide retail sale to a purchaser, for his own use at the fair market value or fair cash price, as the case may be (such purchaser or lessee not being a Related Person),, and (b) an occasional sale of such Inventory to another dealer who is not a Related Person at a price not less than Borrower's cost of the Inventory sold, provided such sale is not a part of a plan or course of action to liquidate all or a portion of the Borrower's business.

"Person" means an individual, partnership, corporation, trust, unincorporated organization, association, joint venture or a government or agency or political subdivision thereof.

"Related Person" shall mean any person (a) which now or hereafter directly or indirectly through one or mor intermediaries controls, or is controlled by, or is under common control with, the Borrower, or (b) which now or hereafter beneficially owns or holds five percent (5%) or more of the, [sic] capital stock of the Borrower, or (c) five present (5%) or more of the capital stock of which is beneficially owned or held by the Borrower. For purposes hereof, "control" shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting stock, by contract or otherwise.

[Doc. 19-6 at pp. 18, 23-24.] Clearly, at all times since October 1, 2010, Leasing and Sales are "related persons" as defined by the Revolving Loan Agreement.

Consequently, the record indisputably establishes that Kris Fellhoelter and Leasing were *not* "without knowledge that the sale violate[d] the rights of another person in the goods," Tenn. Code Ann. § 47-1-201(9), because GFB did not actively release its inventory lien on the Subject Trailers. Thus, Leasing was not a buyer of the Subject Trailers in the ordinary course of business.

To the extent that FMEF's arguments could be interpreted to raise an argument that GFB impliedly authorized the transfer of the Subject Trailers to Leasing by some pattern and practice between GFB and Sales, the Revolving Loan Agreement and Security Agreement provide the answer. First, the Revolving Loan Agreement and Security Agreement prohibit implied waiver or modification by GFB, and the express terms of the agreements control under Tennessee law. *See* Mem. & Order on Mot. for Discovery under Rule 7056 at 7-8, *Greeneville Fed. Bank v. First Farmers & Comm. Bank* (*In re K&L Trailer Leasing, Inc.*), Adv. Proc. No. 3:23-ap-03010-SHB (Bankr. E.D. Tenn. Oct. 9, 2024), ECF No. 51 (relying on Tenn. Code Ann. § 47-1-303(e)). Further, absent knowledge and reliance by FMEF (which has not been alleged), it cannot be the beneficiary of any such implied waiver or modification.

As this Court previously explained, the creditors of Leasing were not without the ability to protect themselves. The Article 9 scheme apportions the risk to the party best able to prevent the harm.

> The continued perfection on disposition of collateral means that "any person seeking to determine whether a debtor owns collateral free of security interests must inquire as to the debtor's source of title and, if circumstances seem to require it, search in the name of the former owner." [Tenn. Code Ann. § 47-9-507 cmt. 3.] Here, the result is that any creditor of Leasing (or any other transferee) that wanted to ensure a first-priority lien on the trailers offered by Leasing as collateral could have inquired about Leasing's source of title.

---

*GFB I*, 630 B.R. at 88.

The Ohio Court of Appeals in *RFC Capital Corporation v. Earthlink, Inc.*, 55 UCC Rep. Serv. 2d 617, 2004 WL 2980402, at *14 (Ohio Ct. App. Dec. 23, 2004), explained the steps available to a purchaser (or, as in this case, to the lender of a purchaser):

> By giving the secured party the power to authorize the release of the security interest, the UCC places the secured party in a superior position over a third party purchaser. Thus, the onus is on the third party purchaser to determine if a security interest exists and ensure that the secured party fully authorizes the release of that security interest. If the third party purchaser does not conduct a search of UCC filings or does not obtain a release, it must bear the risk and/or burden of buying potentially encumbered collateral.
>
> This burden, however, is relatively light. When purchasing goods that are subject to a security interest, the buyer must simply communicate with the secured party disclosed in the UCC filing to determine what conditions, if any, the secured party has placed upon its consent to a release. *See Wabasso State Bank v. Caldwell Packing Co.*, 251 N.W.2d 321, 324 (Minn. 1976) ("[A] simple phone call would have determined whether the bank had authorized [the] sale"). If a secured party discloses that it will only consent if the seller satisfies a condition (whether it be a condition precedent or subsequent to the release), the buyer can then investigate the likelihood of the condition occurring, value the collateral in the context of the potentially ongoing security interest and generally assess the risk of going forward with the transaction. If the buyer determines that the risk presented by the conditional consent is too high, it can decide not to consummate the deal. While the condition may only be in the seller's power to satisfy, the decision to purchase the collateral is totally within the buyer's power.

Given the open and notorious relationship between Sales and Leasing, including their shared location of operations and common owners, FMEF could and should have inquired about the source of the Subject Trailers.  Indeed, the certificates of origin reflecting Sales as the transferor to Leasing were provided to FMEF (which then submitted them to the Tennessee Department of Revenue for issuance of titles with FMEF's lien noted), which could have searched for any inventory liens and could have contacted GFB to learn whether the transfers of the Subject Trailers had been approved by GFB or were sales in the ordinary course under section 47-2-403(2).

Although sometimes the UCC must be applied in a way that seems inequitable, here, the Court has no difficulty applying the UCC to find that GFB's inventory lien remained perfected and attached to the Subject Trailers after Sales transferred them to Leasing, with "financing" provided by FMEF.

Finally, FMEF raises an argument that no other creditor has raised in the numerous cases adjudicated in the past five years over the priority of GFB's inventory lien. FMEF maintains that it holds a PMSI and asserts that GFB has not challenged FMEF's position as a PMSI lienholder in the Subject Trailers. [Doc. 63 at p. 9.] GFB responds that the transfers from Sales to Leasing were not in the ordinary course of business as a matter of law so that GFB's perfected inventory lien was unaffected by the transfers and that FMEF did not give notice to GFB as required by Tennessee Code Annotated section 47-9-324 before Leasing took possession of the Subject Trailers. [Doc. 67 at p. 10.] In fact, Ms. Parks makes clear that she did not receive any inquiry or notice from FMEF's assignor or from FMEF. [Doc. 28-1 at ¶¶ 12, 13.]

The Court construes FMEF's argument as based in the provisions of section 47-9-324, which provides an exception to the normal rule that priority is established by the first to perfect. The exception applies to a PMSI in inventory collateral that is already subject to a prior perfected security interest:

> [A] perfected purchase-money security interest in inventory has priority over a conflicting security interest in the same inventory ... if:
>
> (1) the purchase-money security interest is perfected when the debtor receives possession of the inventory;
>
> (2) the purchase-money secured party sends an authenticated notification to the holder of the conflicting security interest;
>
> (3) the holder of the conflicting security interest receives the notification within five (5) years before the debtor receives possession of the inventory; and

(4) the notification states that the person sending the notification has or expects to acquire a purchase-money security interest in inventory of the debtor and describes the inventory.

Tenn. Code Ann. § 47–9–324(b).  This provision is explained in comment 4:

> The arrangement between an inventory secured party and its debtor typically requires the secured party to make periodic advances against incoming inventory or periodic releases of old inventory as new inventory is received. A fraudulent debtor may apply to the secured party for advances even though it[36] has already given a purchase-money security interest in the inventory to another secured party. For this reason, subsections (b)(2) through (4) and (c) impose a second condition for the purchase-money security interest's achieving priority: the purchase-money secured party must give notification to the holder of a conflicting security interest who filed against the same item or type of inventory before the purchase-money secured party filed or its security interest became perfected temporarily under Section 9-312(e) or (f). *The notification requirement protects the non-purchase-money inventory secured party in such a situation: if the inventory secured party has received notification, it presumably will not make an advance; if it has not received notification (or if the other security interest does not qualify as purchase-money), any advance the inventory secured party may make ordinarily will have priority under Section 9-322. . . .*

Tenn. Code Ann. § 47-9-324, cmt. 4 (emphasis added).  Even if this provision applied to FMEF in these circumstances,[37] the undisputed facts establish that FMEF did not give the required notice for its PMSI to have priority over GFB's inventory lien.

## V.  CONCLUSION

Because GFB has established by undisputed material facts that the transfers of the Subject Trailers from Sales to Leasing were not sales to Leasing as a buyer in the ordinary course of business (because Leasing is charged with knowledge that the transfer was in violation of GFB's inventory security interest), the Court finds that summary judgment in favor of GFB is required under Tennessee law.

---

[36] Notably, the word "it" refers to "debtor," meaning the same debtor that obtains funds from its inventory financier and from a PMSI lender.  Again, here Sales obtained funds from GFB, but Leasing obtained funds from FMEF.

[37] To reiterate, the PMSI provision does not apply to the priority battle here because FMEF's debtor is Leasing, not Sales.

A Judgment consistent with this Memorandum will be entered.


FILED:  March 31, 2025

BY THE COURT

*s/ Suzanne H. Bauknight*

SUZANNE H. BAUKNIGHT
UNITED STATES BANKRUPTCY JUDGE